UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

QUANARDEL WELLS,                              )
                                             )
                    Plaintiff,               )
                                             )
            v.                               )        No. 2:18-cv-00267-JMS-MJD
                                             )
KUENZLI Dr., Regional Med. Dir.,             )
SAMUEL BYRD Dr.,                             )
JACKIE DENNING Dr., M.D.,                    )
BARBARA RIGGS RN,                            )
TILLMAN C/O, Correctional Officer,           )
                                             )
                    Defendants.              )

**ENTRY ON FOUR DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
AND DIRECTING FURTHER PROCEEDINGS**

For the reasons explained in this Entry, the motion for summary judgment filed by

defendants Kuenzli, Byrd, Denning, and Riggs, dkt. [73], is **granted.**

**I.  Background**

Plaintiff Indiana prisoner Quanardel Wells brings this 42 U.S.C. § 1983 civil rights action

against seven defendants, two of whom were dismissed at screening. Dkt. 7. Four of the five

remaining defendants have moved for summary judgment.

In his complaint, Mr. Wells asserts claims of deliberate indifference to his serious medical

needs. Dkt. 2. The summary judgment motion is fully briefed and ripe for resolution.

**II.  Summary Judgment Standard**

Summary judgment should be granted "if the movant shows that there is no genuine dispute

as to any material fact and the movant is entitled to judgment as a matter of law." *Fed. R. Civ. P.*

56(a). "Material facts are those that might affect the outcome of the suit under applicable

1

substantive law." *Dawson v. Brown,* 803 F.3d 829, 833 (7th Cir. 2015) (internal quotation omitted).

"A genuine dispute as to any material fact exists 'if the evidence is such that a reasonable jury

could return a verdict for the nonmoving party.'" *Daugherty v. Page,* 906 F.3d 606, 609-10 (7th

Cir. 2018) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)). The Court views

the facts in the light most favorable to the non-moving party and all reasonable inferences are

drawn in the non-movant's favor. *Barbera v. Pearson Educ., Inc.,* 906 F.3d 621, 628 (7th Cir.

2018). The Court cannot weigh evidence or make credibility determinations on summary judgment

because those tasks are left to the fact-finder. *Johnson v. Advocate Health and Hosps. Corp.* 892

F.3d 887, 893 (7th Cir. 2018).

### III.  Discussion

#### A. Undisputed Facts

The following statement of facts was evaluated pursuant to the standards set forth above.

That is, this statement of facts is not necessarily objectively true, but as the summary judgment

standard requires, the undisputed facts and the disputed evidence are presented in the light

reasonably most favorable to Mr. Wells as the non-moving party with respect to the motion for

summary judgment. *See Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 150 (2000).

Samuel Byrd, M.D. is a physician licensed to practice medicine in the State of Indiana.

During all times relevant to this action, he was employed by Wexford of Indiana, LLC (Wexford)

as a physician at the Wabash Valley Correctional Facility (Wabash Valley). Dkt. 75-2, ¶¶ 1-2

(Affidavit of Dr. Byrd).

Mr. Wells has a medical history of having a laryngocele, which is a cyst or growth in the

back of the throat, near the larynx. On June 28, 2017, Dr. Byrd first saw Mr. Wells regarding his

complaint of throat issues. Mr. Wells explained to Dr. Byrd that he had a recurrence of what

appeared to be a branchial cleft cyst, and they discussed his history of a prior cyst that had been drained in 2009. Mr. Wells reported that it had been resolved until the last few weeks, and he now had hoarseness and was starting to have difficulty swallowing and was concerned about it potentially becoming strangulated. Dkt. 93 at 4. They also discussed a history of ulnar neuropathy secondary to a prior dog bite. Dr. Byrd told Mr. Wells that he could not locate his medical records. Dkt. 95, ¶ 36 (Affidavit of Mr. Wells). Dr. Byrd was not able to determine whether Mr. Wells had any follow up visits with an ear, nose and throat (ENT) specialist since 2009, but given his concerns about a recurrence of the cyst, Dr. Byrd submitted a recommendation for Mr. Wells to be referred for an off-site evaluation from an ENT specialist to determine appropriate steps for treatment of the cyst. Dr. Byrd also continued a prescription of Cymbalta for Mr. Wells' ulnar neuropathy. *Id.*; dkt. 75-2, ¶ 5; dkt. 75-6 at 222-24. Mr. Wells states that Dr. Byrd told him he would call him back for an examination after his medical records were located. Dkt. 95, ¶ 36.

On July 11, 2017, Mr. Wells appeared in the health care unit with worsening symptoms regarding the recurrence of what appeared to be a branchial cleft cyst. Mr. Wells informed Dr. Byrd that he was having hoarseness and what sounded like an altered voice, as well as dysphagia and shortness of breath. Mr. Wells requested that something be done as soon as possible. Dkt. 75-6 at 214; dkt. 75-2, ¶ 6; dkt. 93 at 4.

Following this assessment, Dr. Byrd made a few phone calls. He spoke with Regional Medical Director Dr. Carl Kuenzli regarding Mr. Wells' complaint and medical history. He also called the Terre Haute Regional Hospital and spoke with Dr. Drake, who was an ENT specialist at the hospital. Dr. Drake confirmed that he could schedule Mr. Wells for an evaluation the following morning. Dkt. 93 at 4. Dr. Kuenzli and Dr. Byrd both agreed that while Mr. Wells' condition required medical attention, it did not require an emergent off-site referral and as such, the plan was

for Mr. Wells to be referred for an evaluation the following day from an ENT specialist. Dkt. 75-6 at 214-16; dkt. 75-2, ¶ 6. Mr. Wells testified in his deposition that he overheard Dr. Byrd on the phone say that he wanted to send Mr. Wells to the hospital immediately but Dr. Kuenzli told him to make an appointment instead. Dkt. 75-5 at 21-22; dkt. 95, ¶ 31.

There was a scheduling issue when Mr. Wells was sent to the Terre Haute Regional Hospital on July 12, 2017. He returned to the facility without an assessment. Mr. Wells returned the following day for an evaluation by Dr. Drake. Dkt. 75-6 at 209-12; dkt. 75-2, ¶ 7; dkt. 93 at 4.

Mr. Wells was sent to the Terre Haute Regional Hospital on July 13, 2017 and was thereafter sent to the Indiana University Medical Center in Indianapolis for drainage of the cyst. Mr. Wells returned to the facility July 16, 2017. Dkt. 75-6 at 208; dkt. 75-2, ¶ 8; dkt. 93 at 4-5.

Upon Mr. Wells' return, Tylenol #3 was ordered for pain, he was allowed to be on a regular diet, and a prescription was entered for a wedge pillow to assist with his symptoms. Dkt. 75-6 at 207-08; dkt. 75-2, ¶ 9; dkt. 93 at 5.

Dr. Byrd met with Mr. Wells for a follow-up appointment on July 24, 2017. Mr. Wells complained of intense ear pain every time he swallowed. Dr. Byrd noted that the symptoms of his neck related to the prior cyst were improved, but Mr. Wells was concerned about post-operative complications. Dr. Byrd told Mr. Wells that he would review the surgical notes, as well as discuss the case with the Regional Medical Director regarding appropriate pain management options. Mr. Wells had current prescriptions for Cymbalta for pain relief, antibiotic Augmentin, as well as Pepcid and Colace. Dkt. 75-6 at 198-220; dkt. 75-2, ¶ 10; dkt. 93 at 5. Mr. Wells received Tylenol 3 for a number of days following surgery. Dkt. 75-6 at 193; dkt. 75-2, ¶ 11; dkt. 93 at 5.

Dr. Byrd next saw Mr. Wells on August 4, 2017, for a follow-up appointment. Mr. Wells complained of worsening symptoms and feared that his laryngocele (brachial cyst) had recurred.

He was reporting swelling, hoarseness of voice, dysphagia, and shortness of breath again. He had

finished a 10-day course of antibiotics which provided little benefit. Dr. Byrd had his staff call the

specialist, who moved up a follow-up appointment to August 9, 2017. Dr. Byrd also renewed a

prescription for Decadron 12 mg., which had helped Mr. Wells' symptoms. Dkt. 75-6 at 184-88;

dkt. 75-2, ¶ 12; dkt. 93 at 15.

It was determined that Mr. Wells needed another surgery to completely correct the presence

of the cyst. As such, pursuant to the recommendation of the off-site specialist, Dr. Byrd referred

Mr. Wells for a further surgical evaluation by an otolaryngology specialist. Dkt. 75-6 at 178-80;

dkt. 75-2, ¶ 13; dkt. 93 at 5.

On August 22, 2017, Dr. Byrd followed up with Mr. Wells regarding his condition. Dr.

Byrd noted that Mr. Wells had already been approved for surgery that was going to be occurring

in the next few days with an anticipated hospital stay. Dr. Byrd also ordered a number of labs

including pain medications Tylenol #3 and Neurontin, as well as Norco to be provided following

surgery. Dkt. 75-6 at 155-58; dkt. 75-2, ¶ 14; dkt. 93 at 5-6.

Mr. Wells had surgery at the Indiana University Medical Center on August 24, 2017. He

returned to the facility on August 27, 2017. Dkt. 75-6 at 148-49; dkt. 75-2, ¶ 15; dkt. 93 at 6.

Barbara Riggs is a Registered Nurse in the state of Indiana. During all times relevant to

this action, she was employed by Wexford as a nurse at Wabash Valley. Her responsibilities at the

facility included reviewing health care request slips and assessing patients during nurse sick call.

Dkt. 75-3, ¶¶ 1, 2 (Affidavit of Barbara Riggs, RN).

On July 6, 2017, Ms. Riggs saw Mr. Wells during nurse sick call after he submitted a health

care request stating he was having difficulty seeing. She had Mr. Wells review a Snellen chart, and

his vision was measured as 20/15. Dkt. 75-3, ¶ 4; dkt. 75-6 at 217; dkt. 93 at 6.

5

On July 11, 2017, at the request of Dr. Byrd, Ms. Riggs completed an Outpatient Request (OPR) form for Mr. Wells to be referred for an evaluation by an ENT specialist the following morning. This request had already been verbally approved by then Regional Medical Director Carl Kuenzli. Dkt. 75-3, ¶ 5; dkt. 75-6 at 211-12; dkt. 93 at 6.

Ms. Riggs assessed Mr. Wells on July 12, 2017, after he returned from an off-site consult in Terre Haute, but the appointment with the specialist had to be rescheduled due to a scheduling issue. Mr. Wells returned to Terre Haute the following day for the evaluation. Dkt. 75-3, ¶ 6; dkt. 75-6 at 209-10; dkt. 93 at 6-7.

On August 3, 2017, Ms. Riggs saw Mr. Wells during nurse sick call. He stated that his throat was in pain following surgery and that he had not received a wedge pillow. Ms. Riggs reviewed Mr. Wells' medical records and was able to confirm that he had an appointment that was already scheduled with IU Health for a follow-up about his prior throat surgery. She was able to confirm that Mr. Wells had an active prescription for pain medication Cymbalta and Tylenol #3, as well as Pepcid and Colace. Ms. Riggs was also able to determine that a wedge pillow had already been ordered by medical. Ms. Riggs testified in her affidavit that Mr. Wells thereafter became upset, and she informed him that he needed to rest his voice, given that he had just had surgery. He then became demanding, stating that his family would call the facility to demand action. Given that communication had broken down, she asked Mr. Wells to leave the room. Dkt. 75-3, ¶ 7; dkt. 75-6 at 189-90. Mr. Wells testified in his affidavit that this characterization is false. Dkt. 95, ¶ 32. He states that Ms. Riggs was the aggressor and was very disrespectful towards him. *Id*. With respect to him being scheduled for a follow-up, he testified that Ms. Riggs said, "good luck." *Id*., ¶ 33.

Mr. Wells was evaluated by Dr. Byrd the next day, August 4, 2017. Dr. Byrd renewed orders for medication, and Mr. Wells had a follow-up with his surgeon a few days later. Dkt. 75-3, ¶ 8; dkt. 75-6 at 186-88; dkt. 93 at 7.

Carl Kuenzli, M.D. is a physician licensed to practice medicine in the state of Indiana. During all times relevant to this action, he was employed by Wexford as a physician and as the Regional Medical Director. Dr. Kuenzli is no longer employed as the Regional Medical Director. He is currently employed by Wexford as a physician at the Miami Correctional Facility. Dkt. 103, ¶¶ 1-2 (Affidavit of Dr. Kuenzli).

On July 11, 2017, Dr. Kuenzli was contacted by Dr. Byrd after he had examined Mr. Wells, with complaints of hoarseness from a recurrence of a potential brachial cleft cyst, for which Mr. Wells had received treatment in 2009. They discussed appropriate next steps in Mr. Wells' treatment. Dr. Byrd spoke with Dr. Drake, an ENT specialist, who indicated that he could see Mr. Wells the next morning at the Terre Haute Regional Hospital. Dr. Kuenzli approved Dr. Byrd's request for Mr. Wells to receive an urgent referral to this specialist the following day. Dkt. 103, ¶ 3; dkt. 75-6 at 211-13; dkt. 93 at 7.

Dr. Kuenzli agreed with Dr. Byrd, given his report of Mr. Wells' symptoms, that Mr. Wells did not require an immediate referral to the emergency room on July 11, 2017, and that it was safe for the evaluation to occur the following day. Dkt. 103, ¶¶ 4, 7; dkt. 93 at 7. Mr. Wells had the ability to breathe and ambulate and his vitals were within normal limits. Dr. Kuenzli and Dr. Byrd were also able to confirm an appointment with the specialist for the following morning. Dkt. 103, ¶¶ 4, 7; dkt. 93 at 7-8. Mr. Wells ultimately received surgery on the growth a few days later. Dkt. 103, ¶ 5; dkt. 93 at 7.

Jackie West-Denning, M.D. is a physician licensed to practice medicine in the state of Indiana. During all times relevant to this action, she was employed by Wexford as a physician at Wabash Valley. Dkt. 104, ¶¶ 1-2 (Affidavit of Dr. Denning).

Dr. Denning's first involvement with Mr. Wells' care occurred on January 25, 2018, when she was presented with a request from nursing to issue gap orders. Dkt. 104 at ¶ 5. At that time, Mr. Wells had current prescriptions for Dulcolax, Pepcid and Neurontin, which were about to expire. Neurontin (gabapentin) is a habit-forming medication typically used to treat seizure disorders but can also be used to treat nerve pain. Dr. Denning reviewed the relevant records, noting that the initial prescription of Neurontin was ordered as a 60-day trial, with a recent low-level during blood testing, raising her concern for efficacy of the medication and compliance. *Id*.; dkt. 75-6 at 131. Dr. Denning testified in her affidavit that she did not feel comfortable re-ordering a habit forming and often diverted medication for a patient she had not seen, but it is not ideal to discontinue Neurontin abruptly. Dkt. 104 at ¶ 5. As such, Dr. Denning ordered a tapered dosage of Neurontin over several weeks, which she believed was necessary due to prior low blood levels and her lack of a physical examination of Mr. Wells. Dr. Denning also ordered Dulcolax and Pepcid. *Id*.; dkt. 75-6 at 100, 107.

At no time has Mr. Wells ever diverted Neurontin to anyone. Dkt. 95, ¶ 29. The extreme pain caused by his laryngocele was alleviated by Neurontin.  *Id*., ¶ 30.

Dr. Denning's first evaluation of Mr. Wells occurred on February 12, 2018. He complained of neck pain. She asked many questions to establish the extent to which he could perform his activities of daily living at the facility, such as putting on clothes, going up and down stairs, sleeping, bathing, etc. He also expressed arm pain secondary to a prior dog bite. The neck pain followed his prior surgeries. Mr. Wells did not communicate much information regarding his

8

symptoms, and Dr. Denning noted that she would not expect him to still have localized neck pain this far removed from a July 2017 surgery. Dr. Denning discussed with Mr. Wells potential pain management options, and after their discussion, he agreed to receive Trileptal (oxcarbazepine), which she prescribed for six months. Mr. Wells still had active prescriptions for Pepcid and Dulcolax. Dkt. 104, ¶ 6; dkt. 75-6 at 86-88; dkt. 93 at 11.

Dr. Denning followed up with Mr. Wells on May 1, 2018. They discussed his prior neck symptoms and complaints of ongoing pain. He reported difficulty swallowing which began two weeks before the appointment, and that it was similar to how he felt when he had a large laryngocele. He also expressed some degree of ongoing nerve pain, despite medication. Dr. Denning ordered, and Mr. Wells agreed, to an increased dosage of Trileptal for his complaints of pain. Dr. Denning's concern was also that symptoms of gastro-esophageal reflux disease (GERD) were causing his throat symptoms, so she ordered sucralfate, along with Pepcid. Dr. Denning also prescribed Mobic (meloxicam), which is an anti-inflammatory medication, to determine if an anti-inflammatory would provide any additional relief from his symptoms. Dkt. 104, ¶ 7; dkt. 75-6 at 56-60; dkt. 93 at 11-12.

On May 9, 2018, Dr. Denning submitted a request for Mr. Wells to receive a sleep study. Dkt. 104, ¶ 8; dkt. 75-6 at 51-52; dkt. 93 at 4.

Dr. Denning next saw Mr. Wells on May 22, 2018, for a follow-up regarding his throat symptoms. He reported epigastric pain and heartburn. It was her opinion that Mr. Wells' symptoms were worse, which can sometimes occur with anti-inflammatory medication. She therefore discontinued the Mobic and ordered omeprazole for the epigastric complaints. Dr. Denning did not believe Mr. Wells had a recurrence of his laryngocele because she could not palpate any growth, and given his symptoms, she would expect any growth that could cause these symptoms

9

to be palpable on exam. As such, Dr. Denning decided to focus treatment on the GERD symptoms. Dkt. 104, ¶ 9; dkt. 75-6 at 31-34; dkt. 93 at 12.

This action was filed on June 13, 2018. Dkt. 2. Dr. Denning saw Mr. Wells on June 19, 2018, after he reported ongoing symptoms during nurse sick-call. She reviewed his lab results, which were relatively normal. He expressed that his throat still did not want to clear, but he denied heartburn. He reported that his symptoms were not improved on his current treatment plan. Dr. Denning performed a thorough assessment of Mr. Wells' arm and neck complaints and noted his complaints of pain and numbness with tingling of the arm. They discussed potential medication options, and Mr. Wells agreed to a trial of Cymbalta for his pain management. She also recommended that Mr. Wells be referred to see an ENT specialist regarding his throat complaints. Dr. Denning continued his prescriptions of Colace, omeprazole and sucralfate. Dkt. 104, ¶ 10; dkt. 75-6 at 11-14; dkt. 93 at 12-13. Mr. Wells was transferred to Pendleton Correctional Facility in August 2018. Dkt. 75-5 at 8.

Dr. Denning testified in her affidavit that she was presented with a request to renew a potentially habit-forming medication for a patient several months removed from surgery, with a seriously low level on testing, someone she had not had the opportunity to examine. In Dr. Denning's professional opinion, it would have been inappropriate to continue that medication at its current dosage, given these facts. Dkt. 104, ¶ 13. Therefore, she ordered a tapered dosage, as is standard for Neurontin, and Mr. Wells was examined shortly thereafter and prescribed an alternative medication. *Id*. Trileptal is approved by the FDA for treatment of patients with chronic nerve pain. It is an acceptable alternative to Neurontin, with less concern for diversion or misuse. *Id*., ¶ 14.

10

### B. Analysis

Mr. Wells was a convicted prisoner at all relevant times. This means that the Eighth Amendment applies to his claims. *Estate of Clark v. Walker*, 865 F.3d 544, 546, n.1 (7th Cir. 2017) ("the Eighth Amendment applies to convicted prisoners"). To prevail on an Eighth Amendment deliberate indifference claim, a plaintiff must demonstrate two elements: (1) he suffered from an objectively serious medical condition; and (2) the defendants knew about the plaintiff's condition and the substantial risk of harm it posed but disregarded that risk. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994); *Walker v. Wexford Health Sources, Inc.*, 940 F.3d 954, 964 (7th Cir. 2019); *Petties v. Carter,* 836 F.3d 722, 728 (7th Cir. 2016); *Pittman ex rel. Hamilton v. Cty. of Madison, Ill.*, 746 F.3d 766, 775 (7th Cir. 2014); *Arnett v. Webster,* 658 F.3d 742, 750-51 (7th Cir. 2011). "A medical condition is objectively serious if a physician has diagnosed it as requiring treatment, or the need for treatment would be obvious to a layperson." *Pyles v. Fahim,* 771 F.3d 403, 409 (7th Cir. 2014).

The defendants do not dispute that Mr. Wells suffered from an objectively serious medical condition. Only the subjective component of the deliberate indifference claims is at issue.

### Dr. Byrd

Mr. Wells brings a claim against Dr. Byrd because Dr. Byrd allegedly did not call him for a follow-up appointment after his initial visit regarding a recurrence of his throat condition. He also believes that Dr. Byrd should have referred him to see a specialist at an earlier time. When Mr. Wells first saw Dr. Byrd on June 28, 2017, Dr. Byrd said he did not have his medical records, and so he would call him back for an examination when the records were found. Dkt. 95 at ¶ 36. In his deposition, Mr. Wells testified that Dr. Byrd sent the records nurse to try to find the records, but in the meantime, Dr. Byrd said he couldn't treat Mr. Wells because he had no information on

him. Dkt. 75-5 at 32. Mr. Wells asserts that Dr. Byrd failed to call him back.

Mr. Wells contends that the Indiana Department of Correction lost his medical records and this delayed his treatment. When a plaintiff alleges that a "defendant delayed, rather than denied, medical treatment—we have required that the plaintiff present verifying medical evidence that the delay, and not the underlying condition, caused some harm." *Walker*, 940 F.3d at 964 (internal quotation omitted). "Most importantly, the plaintiff must show that the defendant's actions or inaction caused the delay in his treatment." *Id*. In this case, there is no evidence that Dr. Byrd "lost" Mr. Wells' medical records. Moreover, Dr. Byrd did see Mr. Wells again less than two weeks later, on July 11, 2017, and there is no medical evidence showing that Mr. Wells was harmed by the alleged delay.

"[W]e look at the totality of an inmate's medical care when considering whether that care evidences deliberate indifference to serious medical needs." *Petties*, 836 F.3d at 728. The record shows that Dr. Byrd saw Mr. Wells regarding his throat issues from late June 2017 until late August. During that time, Dr. Byrd recommended that Mr. Wells see an outside ENT and prescribed medications in response to Mr. Wells' conditions and symptoms. Mr. Wells had surgery in mid-July 2017. After Mr. Wells returned to the facility on July 16, 2017, Dr. Byrd ordered pain medication, a regular diet, and a wedge pillow. When Mr. Wells complained of worsening symptoms on August 4, 2017, Dr. Byrd had his staff arrange an earlier follow-up appointment with the surgeon. When it was determined that a second surgery was needed, Dr. Byrd referred Mr. Wells to another specialist for a surgery consultation. The second surgery was performed on August 24, 2017. Dr. Byrd ordered pain medication and Neurontin to be provided following surgery. Mr. Wells does not argue that any of this treatment was inappropriate or non-responsive to his complaints. No reasonable jury could find that Dr. Byrd acted with deliberate indifference

in treating Mr. Wells.

### Dr. Kuenzli

Mr. Wells brings his claim against Dr. Kuenzli because he believes that Dr. Kuenzli overrode Dr. Byrd's decision and decided that Mr. Wells' condition did not require an emergency room admission on July 11, 2017, without ever examining him. Mr. Wells testified in his affidavit that he overheard Dr. Byrd saying that he wanted to rush Mr. Wells to the hospital but Dr. Keunzli told Dr. Byrd to make an appointment. Dkt. 75-5 at 21. Dr. Byrd and Dr. Kuenzli both testified in their affidavits, however, that they agreed that sending Mr. Wells to the hospital that night on an emergent basis was not necessary. Both physicians knew that the specialist was available the following day, which is what Dr. Kuenzli approved, and the appointment was scheduled. Even if Mr. Wells' testimony is accepted as true, there is no medical evidence that the delay of a matter of hours in sending Mr. Wells to the specialist caused any verifiable harm. *Walker*, 940 F.3d at 964.

Unfortunately, there was a scheduling issue on the specialist's end, so Mr. Wells ended up being seen a day later. That scheduling issue had nothing to do with Dr. Kuenzli or Dr. Byrd. No reasonable jury could find that Dr. Kuenzli was deliberately indifferent to Mr. Wells' medical condition.

### Nurse Riggs

Mr. Wells brings a claim against Nurse Riggs because she allegedly denied him treatment and refused to refer him to see a doctor during a sick call appointment. In his deposition, Mr. Wells stated that Nurse Riggs made fun of the way his voice sounded. Dkt. 75-5 at 18. He also testified that she refused to refer him to see a doctor. *Id.* In his affidavit, Mr. Wells contends that on August 3, 2017, Nurse Riggs refused to review his complaints and review any medical records. Dkt. 95 at ¶ 33. He asserts that she was the aggressor and was disrespectful to him during that appointment.

*Id.* at ¶ 32. He argues that she refused to refer him to a doctor, saying "good luck" getting scheduled for a follow-up appointment. *Id.* at ¶ 33.

While the parties disagree as to who behaved unprofessionally or disrespectfully on August 3, 2017, even assuming Nurse Riggs did not behave appropriately, Mr. Wells' allegations do not support a claim of deliberate indifference to a serious medical need. Mr. Wells was, in fact, seen by Dr. Byrd the following day, August 4, 2017, so the follow-up appointment with a doctor was made. To the extent it could be argued that there was a delay of less than 24 hours, there is no medical evidence that this alleged delay caused any harm to Mr. Wells. Without such evidence, his claim of deliberate indifference fails. *Walker,* 940 F.3d at 964. Even if Nurse Riggs was negligent, that would not be sufficient to support a deliberate indifference claim. *Id.* ("[E]vidence of medical negligence is not enough to prove deliberate indifference….") (internal quotation omitted).  No reasonable jury could find that Nurse Riggs was deliberately indifferent to Mr. Wells' medical condition.

### Dr. Denning

Mr. Wells' claim against Dr. Denning is that she disregarded his symptoms and discontinued his Neurontin. Mr. Wells argues that Dr. Denning should have examined him before discontinuing his Neurontin medication in late January 2018. Dkt. 75-5 at 23. He also argues that Dr. Denning did not taper him off the medication. Dkt. 93 at 10; dkt. 95 at ¶ 19. Rather, he asserts that the medication was cut off entirely. In support of this contention, he points to a medical record dated January 25, 2018, showing the discontinuance of Neurontin. Dkt. 75-6 at 100. The medical records also show, however, a chart update that same day that indicates "taper neurontin" with a prescription of Neurontin 300 mg, "1 capsule by oral route every day." *Id.* at 102. Mr. Wells' contention that Dr. Denning failed to taper him off the

medication is not supported.

He further states in his affidavit that the prescription was not about to expire, nor was it a 60-day trial prescription, as stated by Dr. Denning. Dkt. 95 at ¶¶ 13-14. Contrary to his statement, however, the medical records reflect that Dr. Byrd requested a 60-day trial of Neurontin on October 26, 2017. Dkt. 75-6 at 131.

Mr. Wells also argues that although he did agree to trying an increased dosage of Trileptal and later Cymbalta for pain, this was because Dr. Denning refused to renew his prescription for Neurontin even though it had been effective in relieving his extreme pain. Mr. Wells testified in his affidavit that he never diverted Neurontin to anyone else. Dkt. 95 at ¶ 29. Dr. Denning, however, never alleged that Mr. Wells personally abused Neurontin. She was aware that his blood work showed low levels of the medication and that Neurontin was "habit forming and often diverted." Dkt. 104 at ¶ 5.

On this record, no rational trier of fact could find that Dr. Denning's decision to taper off the Neurontin was deliberately indifferent to Mr. Wells' serious medical needs. Dr. Denning did not arbitrarily decide to cut off the medication. Rather, she noticed the low levels in his blood work which raised her concern for efficacy of the medication and compliance. She also prescribed other medications in an attempt to reduce Mr. Wells' pain. "[A]n inmate is not entitled to demand specific care, and medical professionals may choose from a range of acceptable courses based on prevailing standards in the field." *Walker*, 940 F.3d at 965.

Mr. Wells argues that Dr. Denning persisted in a course of treatment she knew was ineffective. If the evidence supported this contention, it could support a claim of deliberate indifference. *See Petties*, 836 F.3d at 729–30 (One example of when "a departure from minimally competent medical judgment" can be shown is "where a prison official persists in a course of

15

treatment known to be ineffective."). Here, however, when Dr. Denning tapered off the Neurontin, she did not know that the other medications she prescribed would be ineffective in alleviating Mr. Wells' pain. Rather, she exercised her professional judgment, based on several factors, in determining that she was not comfortable renewing the Neurontin. When she did see Mr. Wells, she exercised her professional judgment and determined that it would be preferable to try other medications for pain.

Even if Mr. Wells had shown negligence or gross negligence on the part of Dr. Denning, which he has not, it would not rise to the level required to defeat summary judgment on an Eighth Amendment claim. Courts "defer to medical professionals' treatment decisions unless there is evidence that no minimally competent professional would have so responded under those circumstances." *Walker*, 940 F.3d at 965 (internal quotation omitted).  Here, there is no such evidence.

During the time Dr. Denning treated Mr. Wells, she prescribed pain medications, ordered lab tests, examined him, treated complaints of GERD, and referred him to an ENT off-site. The totality of Dr. Denning's treatment shows that she was not deliberately indifferent to Mr. Wells' serious medical condition.  No reasonable jury could find otherwise.

## IV. Conclusion

For the reasons discussed above, the motion for summary judgment filed by defendants Kuenzli, Byrd, Denning, and Riggs, dkt. [73] is **granted.** A partial final judgment will not issue at this time because this ruling does not resolve all claims in this action.

Mr. Wells and the remaining defendant, Officer Tillman, have both reported that a settlement conference would be beneficial. Dkt. 84; dkt. 85. The Magistrate Judge is requested to set this matter for a status conference to discuss the resolution of the claim against Officer Tillman.

**IT IS SO ORDERED.**

Date: 6/19/2020

Hon. Jane Magnus-Stinson, Chief Judge
United States District Court
Southern District of Indiana

Distribution:

QUANARDEL WELLS
881139
PENDLETON - CF
PENDLETON CORRECTIONAL FACILITY
Electronic Service Participant – Court Only

Douglass R. Bitner
KATZ  KORIN CUNNINGHAM, P.C.
dbitner@kkclegal.com

Joshua Robert Lowry
INDIANA ATTORNEY GENERAL
joshua.lowry@atg.in.gov

Magistrate Judge Mark J. Dinsmore